Case No. 14-5224, Walter J. Jackson, Jr., Appellant v. Raymond Edwin Mabus, Jr., Secretary of the Navy at Ell. Mr. Wells for the Appellants, Mr. Kelly for the Appellees. Good morning, Your Honors. John Wells for Walter Jackson, may it please the Court. In my brief and before this Court and others, I've argued that we generally give the Correction Boards way too much deference, and I think this is an example of why. In this particular case, the Correction Board should have and could have followed the existing regulations and found that Mr. Jackson's record should be corrected, starting with DOD 1327.6. I will agree with everyone, and that's on AR 150, or Joint Appendix 159, I believe. I will agree with everyone that it's probably a very esoteric regulation. It's one that not a lot of people know about, but it is the regulation. It's the regulation that was the guidance in this particular case. Is there any place in the record here where the government addresses that claim? No, Your Honor, and it was brought up before both the BCNR and in the Court below, which is one of the things that makes it so bothersome. The problem with it is the folks that were in Bahrain, the commanding officer was not an expert on the travel regs. I happened to find out about it because I came home from the Persian Gulf on emergency leave. My mother was dying, found out that my transit time did not count as leave, and then I surrendered back or reported back to the Court of Embarkation. So when I got this case, I actually looked to see if it was the same as FEML, and it certainly was. I understand why people didn't know about it, but it was brought to the BCNR's attention. So we've got that issue where he was issued a government travel document with a government ticket paid for by the United States government that said get to the plane at this time, and he did that. He was confused. He had already been counseled on a previous issue of leave, so he kind of went the extra mile there and went to the command duty officer and said, hey, CDO, am I supposed to go ahead and do this, you know, go catch this plane? There was no way to check with SADO. It was the Muslim Sabbath on Bahrain. They didn't recognize that. SADO was closed. So the CDO, who had the authority, said yes, go catch the plane. And this is the second area where the BCNR failed because they found, without any kind of documentation, citation, or any authority, that the command duty officer did not have the authority to modify the leave. But if you look at the appendix, I think we're starting at 160, there are several documents, including their own instruction, which says, in fact, the command duty officer sits in the stead of the commanding officer or the executive officer and has that power. I will apologize. I believe it's 166, which is the government, I'm sorry, the NAVCOMS, Naval Communication Station Directive. It's very hard to read, especially when you get up to my age. But if you can kind of look through the black and down, it's the best copy I had. It does show that they stand in second line, that the CDO is the direct. I'm sorry, what page are you on? 166, appendix 166. It's the NAVCOMS tell Bahrain instruction 1601.2 Bravo up at the top left-hand corner. And the first paragraph has been highlighted with some color of a highlighter. It's not a good copy, I'm sorry, but it's the one I have. And it says the command duty officer does stand in, or the direct representative of the commanding officer. The papers before that, the pages before that, the Naval Orientation Book, the Standard Organization and Regulations Manual of the Navy, specifically stated the duties of the command duty officer. I've been a command duty officer for my 22 years in the service. I guarantee you you had that authority. Now, did he make the right decision? Arguably he did. But even if he didn't, he still had the authority, and certainly the apparent authority, to make that decision and send the kid on leave. And that's what it comes down to. Now, Mr. Jackson, for whatever reason, had gotten into a bad stead with the command. That happens, okay? He also had 16 years of good service and was put out of the Navy, as an I agree enlistment at that point, with only four years to go to retirement. The government, in their brief, talks about a number of things such as, well, he was a troublemaker, not a good guy, you know, something went wrong. He went back on active duty with the National Guard and, in fact, had a good career during the BP oil spill. So, you know, we have this one period where all of a sudden this guy is a bad guy, and 16, really 17 years, where he was a good guy. Something's wrong here. What's wrong is somebody took a dislike to this guy. The correction board was set up for the purpose of ferreting those things out and correcting them. They chose not to do that. In choosing not to do that, they did not apply the DOD directive. They did not apply all the Navy regulations, the standards, the customs of service, as to the command duty officer. Then let's look at the vacation of suspension that actually took him down one pay grade, okay? He gets into an argument with the chief petty officer. That happens. He's an E6, she's an E7, they're one pay grade difference. It happens. It happens all the time. I mean, I've argued with my bosses, okay? Gets into an argument, is not given a hearing before they pull and vacate that suspension, and I believe it was on the last day or possibly the day before that the CO could do it. So now we're looking at no hearing, no opportunity to be heard. The Navy manual of the judge advocate general, I'm sorry I slipped into the vernacular, specifically says that in almost anything but very unusual circumstances, you should grant them a hearing, okay? I've administered MASTS, probably the only one in this room that has, and I've only vacated suspension once, and I guarantee you I gave them a hearing because that's what the book says to do. That's what the manual of the judge advocate general says to do. 10 U.S.C. 1552 is an equitable statute, okay? It basically says correct injustice. Here the BCNR conceded by reviewing the polygraph test, Mr. Jackson believed he was in the right. Even if you can find a technical violation, and in light of that DOD instruction and in light of the custom service and directives for a command duty officer, I don't think you can. But even if you could, equitably, the BCNR should have acted. The original May 7, 07 letter details a series of things. And there's not just one thing here. Yeah, you're talking about the Navy's original letter. At 68? I have it at 40. AR 40. It's the May 7, 07 letter, Mr. Jackson. Right, I'm looking at it right now. It just goes through a series of things. And if you look again at some of the things that are reflected in there, for example, the May 2006 attempted suicide, the allegation that he escaped control of, you know, somebody who was escorting him back to the States, all that comes from an ex parte letter that was brought up to the Board for Correction Naval Records. We were not even initially given an opportunity to comment on it. It was an advisory opinion. But, in fact, it was written not by an organization of the Department of the Navy empowered to give advisory opinions. It was written by the same command that imposed the non-judicial punishment. You know, and if you look at the Christopher decision. There's the unauthorized leave. There's the insubordinations. There's the escaping from the escort. There's the refusal to go to scheduled appointments. There's the second adverse enlisted evaluation. And I realize you could pick off each of these, but there are a series of things here. Every time you write a series of things, that doesn't mean it's true. I totally agree with that. But I'm just saying there's more than just the one thing. I understand, Your Honor. But we have to go at what he was actually convicted of at an NJP or captain's mast. And that's why we concentrated on that. I understand. Because it was the seminal document. You take away the NJP, the captain's mast. You take away the NCO evaluation because that was in reliance on the captain's mast. You take away everything. That was the seminal document. Your Honors, I'm into my rebuttal time. If you have any questions. I do have a question. You went through a lot of things very quickly. Sorry, Judge. And I'm trying to follow the arguments here. So you started off by saying there is this administrative leave regulation, which no one understands. And you also said the command duty officer clearly has the authority to do what he did. Yes, ma'am. So it's hard to read that initial document that you cited to us. But as best I can make it out through the highlighting, it says something like the CDO is the direct representative of the commanding officer unless specifically relieved of this responsibility. That's correct. Okay. So what I want to ask you about is back on page 93. Okay. So on 93, there's a specific leave policy here for Bahrain. And it says the CDO will coordinate official responses to extension requests with the member's chain of command. And that the commanding officer or executive officer will approve all leave extensions. Yes, ma'am. Which suggests to me that that was, in fact, something he couldn't do under this leave policy. Am I wrong about that? Yes, ma'am. And the reason is because we're talking about leave extensions which happen after you've actually executed the leave. For example, later on when he was in return because of Katrina, the CDO with the concurrence of the CO and the XO actually gave some leave extensions. But this was not a leave extension. It was actually departing on the travel status prior to the start of the leave. And under the DOD regulation, the travel status did not count the leave. In other words, his leave did not start until he got back to the United States. His leave ended when he got back to the port of embarkation. And if you'll notice, and, again, I understand the confusion on this. It's easy to get confused. There's very few people who, and I learned about it, like I said, just because of personal experience. But if you look at this whole process, this started out as an environmental morale leave or an EML, in which case if it had continued as an EML, a leave would have started at the point that he left at Bahrain and ended when he got to Bahrain. The difference is with an EML, you take a space available military transport. So, for example, if there was a C-141 leaving Bahrain on his leave date, he would have been put on that 141, and his leave would have started when he got on the 141 and when he got back. Because there was no military transportation available that day, it morphed into what they call the funded environmental leave, FEML, which now the rules is somewhat different, and it says the transit time to and from does not count as the leave. The reason we have this is, as it was explained to me, is budgetary in nature because the federal government cannot fund a transportation when he's on leave or when a military member is on leave. Because when you're on leave, you're supposed to pay for everything yourself. So because they're in this remote location, and I've been to Bahrain, it's very remote, you are given funded leave to get back to the continental United States, or not funded leave, funded transportation to get back to the United States. Once you reach the United States, then your leave goes into effect, and then any further transportation that you have that's going to fly to New Orleans or whatever, that's on your own hook. I know it's confusing. I hope I made it kind of clear. I think I'm following that. So in your view, then, this all starts because he's on unauthorized status. That's the beginning of the discipline here. And your argument would be that he was never on unauthorized status, so everything that flowed from that was incorrect. Your Honor, you're exactly right. I am. And does that make it clear as mud for you? Yes. Okay. Thank you. Again, I'm way over time. I'm sorry. I hope you grant me a little bit of rebuttal in case my friend Mr. Kelly misspeaks and I have to mention something. But did you all have any more other questions? No. Thank you. Thank you. Good morning, Your Honors. And may it please the Court, Wynn Kelly on behalf of the BCNR and the government in this case. Your Honors, first I'd like to address Judge Williams' question, which is the government did address the funded environmental and morale leave on page 32 and 33 of its brief and explained that the instruction that Mr. Jackson relies on does not give the purchase that Mr. Jackson wishes it did in that. Is this explanation anywhere in the record? In the BCNR, so the BCNR, based on the record before it, concurred with the conclusion of the commanding officer at the nonjudicial punishment that Mr. Jackson was in unauthorized leave status. And that, in turn, responds to the regulation that we have before us? Your Honor, if the Court looks to the original May 7th opinion, and that's at Joint Appendix 68 and 69, the BCNR does state that it specifically referenced all regulations, statutes. That's normally not good enough. Normally when an agency is interpreting a regulation, it gets the text, explains why it's reading it in a particular way to say, look, the regulations doesn't do it. Well, two responses to Your Honor's question or comment. The first is this case needs to be viewed in context, which is, and Mr. Wells conceded, Mr. Jackson had just been warned three months prior about an issue he had with his leave. He had checked in late on leave. That doesn't make every subsequent leave court-martial worthy. He was written up and warned about the leave issue. You aren't responding to my point. But if the regulation cited means what counsel says it means, and on its face it seems to point that way, then doesn't the government at some point have to address that? The regulation does not mean what Mr. Jackson says it means. And as we stated in our brief, it relates to the calculation of leave that's charged to the member. That is separate and apart from the court-martial charge of unauthorized absence from your post. There are two separate issues. He could leave. Counsel described a link between them, and that is that in order to have the funded leave, the actual travel had to be without leave, right? Maybe that's completely hokey, but he offers that as an explanation, and it's not on its face completely hokey. The government concedes that that is correct, Your Honor. However, he would have a leave authorization to leave on July 30th, as he did, and come back on August 14th. And the travel time when he properly left the base would not count against his leave balance, once his leave was actually charged when he checked back in. But he doesn't have the authority to say, oh, even though my papers only allow me to leave the base on July 30th, I can leave a day earlier because my flight leaves earlier. And what's important, Your Honor, is the record is filled with Mr. Jackson acknowledging this, particularly at Joint Appendix 120, where he notes that his offenses were minor. And he doesn't understand why he's being punished for these issues by being dismissed from the Navy. At Joint Appendix 39, what was the— What is it you're pointing to? Joint Appendix 120? Yeah. Paragraph 8, about halfway down, this is when everything seemed to take a turn for the worst. My offenses were minor and disposed of at captain's mast. I accepted my punishment and continue to do, I believe that should be my job to the best of my ability. And the record before the board, the advisory opinion, which this court and Roberts noted that the BC&R can properly look to, at Joint Appendix 70, at the bottom, after counsel with Lieutenant Parr, Petty Officer Jackson decided to accept nonjudicial punishment and avoid a federal conviction, an offense that he would have been found guilty of at court-martial due to his confession of being UA. At NJP, he was found guilty of being UA. And that leads to my next point, Your Honors, which is Mr. Jackson, both in the district court and here, has attempted to rely on this theory that the command duty officer somehow has the authority to excuse a member's absence from his post. First, there's nothing in the regulations that specifically says that. Merely being the direct representative at the post doesn't mean that you have the authority. There's no evidence in the record that either the commanding officer herself or the executive officer was absent, were absent, which might, again, might have allowed the command duty officer to modify leave. But what's most important is the person who has the authority to modify leave is the commanding officer. The commanding officer herself is the one who administered the nonjudicial punishment, and she is the one who had the opportunity to review all of the records, and she's the one who had the opportunity to hear all of the arguments that Mr. Jackson attempts to make here, and she found him guilty. Mr. Jackson accepted that punishment, and it was a light punishment. Mr. Jackson met with counsel five times, accepted that punishment, which was a wise choice because if he had gotten a court-martial, he would have gotten a bad conduct discharge and had a federal conviction on his record. His punishment was one half pay for two months and a reduction in grade, which was suspended for six months. All he had to do was stay out of trouble. He made it through five months, and then he got into an altercation with a superior officer, a chief petty officer, admitted at the disciplinary review board exactly what the chief petty officer said occurred, that he had screamed at her and said that he did not respect her ghetto style of leadership, and then the commanding officer properly vacated the suspension. Mr. Wells and Mr. Jackson claimed that he should have had some sort of hearing, and there's two responses to that. First, he had a hearing before the disciplinary review board where he admitted all of the conduct at issue, so there should be no additional process necessary, and the JAG manual that Mr. Jackson relies on does not have mandatory language. It says should, and as this court held in Cone v. Caldera, where there's military regulations that do not have mandatory language but simply suggested language, this court needs to defer, and that's at 223 Federal Reporter 3rd, 789 on page 793, where the regulation does not mandate that the court should defer to the military's and the BC&R's interpretation. As Judge Kavanaugh pointed out, the BC&R had in the record before it a string of offenses by Mr. Jackson, and Mr. Jackson did have 16 years of service when he was in Bahrain, and he was also a noncommissioned officer. He was tasked with leading other sailors and was tasked with knowing all of these procedures. He had been counseled. He left in unauthorized status. He came back late. There's no evidence in the record that he attempted to call while he was on his funded environmental morale leave and had his leave extended. He just came back late. He accepted nonjudicial punishment after consultation with counsel. The commanding officer found him guilty. He was placed on suspended punishment. He could not stay out of trouble, and so therefore he was properly found to not be eligible for reenlistment. You know, the BC&R does not give as detailed an explanation of why it was okay to vacate this suspension without further notice as you did. Is what they did here sufficient for us to decide we can discern how they figured it out? Because your explanation would just be ad hoc rationalization. Your Honor, we don't believe that this is any issue of post hoc rationalization. I'm trying to point the court to the specific language in the argument. I only see one sentence there, but if there is a better explanation, it would be helpful. In the BC&R's decision, the board does incorporate... October 15th, 2013. Your Honor, I'm looking at the May 7th, 2007, so that's at Appendix 68 and 69.  The board also found no error of injustice in the vacation action, which I believe is what Judge Brown was referring to. It does incorporate the memorandum on the outside. I guess the response is the board did acknowledge that it found no error, and the record does contain, and I can point the court to it, the hearing before the Disciplinary Review Board where it states that Mr. Jackson admitted to the conduct, and that is... That's at Joint Appendix 102. That's the record of the disciplinary hearing before the board. Your Honor, the original... Once the Disciplinary Review Board referred it, they referred it for nonjudicial punishment. That's at Appendix 106 to 109, and then the commanding officer's explanation of her vacation is at Article 110... Excuse me, Appendix 110. As we set forth the path of the BC&R's decision-making there, because of the record before it, it's clear. Judge Brown, if I may just make one more comment and briefly conclude? Okay. The other thing I would respond to your question, Your Honor, is the board here provided Mr. Jackson multiple opportunities on remand to provide all of the information that he possibly could, and some, if not all, of these arguments were not before it. It was amply supported by the record, particularly the multiple incidents of misconduct by Mr. Jackson, and for those reasons, we would ask that the judgment of the district court be affirmed. All right. Thank you. I know that Mr. Wells had no time, but we will give you two minutes of remote time. Thank you, Your Honor. Very briefly, CDO issues and the DoD 1327.6, which are the key issues in this case, along with the JAG man, were before the board because I submitted them to the board. And let's talk about the JAG man. Mr. Kelly used the term should, and he's only reading from part of it. If you look at page 33 on our original brief, we did quote from it, Before vacating a suspension, a commanding officer ordinarily shall, which is mandatory. It's modified by ordinarily, which means in just about every case, unless you've got a good reason, shall notify the service member and give that member the opportunity to respond. That did not happen here. The Discharge Review Board, let's look at what it is. It's not a hearing. The people that make up the Discharge Review Board are chief pay officers sitting there doing an administrative screening, and they have no powers under the Uniform Code of Military Justice. Only a court martial or the commanding officer have powers under the Uniform Code of Military Justice. It's a recommendation. It's a screening. It's used basically to weed out the wheat in the chaff between two seamen who argue with each other. This time we have between a first class and a chief, and, of course, it was chiefs making up the board. I'm not surprised that they came to the decision they did. But let's go back to, I think, what is the most important thing here is 1327.6, which the government concedes. It says what it says. There are additional issues, including a SATO governmental travel order and travel ticket. He says there's no authority for Jackson to have left. That gives him the authority. Secondly, look at the CDO again, not just on those. Can I interrupt you? Because he made one point that I had not thought about this. You argue that the CDO authorized his leave on the front end. Right. But counsel also said he returned late as well, didn't call in, didn't do anything about that. So there isn't an answer on the back end, or is there? Yes, ma'am, there is. Again, and I think I mentioned this initially, under the leave expires back at the port of embarkation, which in, you know, let's just say Norfolk, Virginia. I'm not sure where it was. Norfolk or Philadelphia is usually where it is, not at Bahrain. So he got back to Norfolk or Philadelphia, wherever it was, within his time limitation. Okay. And, again, that goes with the transit time is not considered leave time. So he was in business on that. The CDO, you know, please look at 160 to 166. It's both the standard organization regulation manual of the Navy and naval orientation. It explains what the CDO does. The CDO has that authority. You know, I've done it before. And that's the problem. The Board for Corrections and Naval Records should understand that, and they don't. And I'm sorry. I'm over time again. I apologize. But, you know, I was hoping that Mr. Kelly would say he had some sympathy for Mr. Jackson also. But he's also, on a point of privilege, a good guy. And he served his time, and he deserves his retirement. Thank you. Your honors. Thank you. The case will be submitted.
judges: Brown, Kavanaugh, Williams